Nos. 22-35650, 22-35698, 22-35711

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
─────────────────

DRU CHOKER, D.V.M. AND MATTHEW
DEMARCO, D.V.M.,

*Plaintiffs-Appellants-*
*Cross-Appellees,*

v.

PET EMERGENCY CLINIC, P.S. AND NATIONAL
VETERINARY ASSOCIATES, INC., acting on its own
behalf and that of NVA Parent, Inc.,

*Defendants-Appellees-*
*Cross-Appellants.*
─────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
WASHINGTON
(JUDGE STANLEY A. BASTIAN)
─────────────────
BRIEF FOR THE UNITED STATES OF AMERICA AS
AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-
APPELLANTS
─────────────────

JONATHAN S. KANTER
  *Assistant Attorney General*
DOHA G. MEKKI
  *Principal Deputy Assistant*
  *Attorney General*
MAGGIE GOODLANDER
  *Deputy Assistant Attorney General*
DAVID B. LAWRENCE
  *Policy Director*
JACOBUS VAN DER VEN
  *Counsel to the Assistant*
  *Attorney General*

DANIEL E. HAAR
STEVEN J. MINTZ
  *Attorneys*
U.S. Department of Justice,
Antitrust Division
950 Pennsylvania Ave., NW
Washington, DC 20530-0001
Tel. 202-353-0256

# TABLE OF CONTENTS

STATEMENT OF INTEREST ...................................................... 1

STATEMENT OF ISSUES PRESENTED ............................... 2

STATEMENT ............................................................................. 2

SUMMARY OF ARGUMENT ................................................. 9

ARGUMENT .............................................................................. 11

   I.   Antitrust Law Recognizes Standing for Nascent Competitors. .... 12

  II.   Ninth Circuit Precedent Recognizes Antitrust Standing for Certain Dismissed Employees. ...................................................... 22

CONCLUSION ........................................................................... 31

CERTIFICATE OF COMPLIANCE ...................................... 33

CERTIFICATE OF SERVICE ................................................ 34

# TABLE OF AUTHORITIES

**Cases**                                                                      **Pages**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................ 14

*Anderson v. Shipowners Ass'n of Pacific Coast*,
   272 U.S. 359 (1926) ........................................................................ 28

*Ashmore v. Northeast Petroleum Div.*,
   843 F. Supp. 759 (D. Me. 1994) ......................................... 26, 27, 31

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ........................................................................ 23

*Aya Healthcare Services v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021) .......................................................... 30

*Blue Shield of Virginia v. McCready*,
   457 U.S. 465 (1982) ............................................................. 23, 26, 29

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ........................................................................ 11

*Chelson v. Oregonian Pub. Co.*,
   715 F.2d 1368 (9th Cir. 1983) ....................................................... 29

*Donahue v. Pendleton Woolen Mills, Inc.*,
   633 F. Supp. 1423 (S.D.N.Y. 1986) .......................................... 26, 27

*Fine v. Barry & Enright Productions*,
   731 F.2d 1394 (9th Cir. 1984) ........................................... 13, 16, 21

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003) .......................................................... 20

*Hecht v. Pro-Football, Inc.*,
   570 F.2d 982 (D.C. Cir. 1977) ....................................................... 21

*Huron Valley Hosp., Inc. v. Pontiac*,
   666 F.2d 1029 (6th Cir. 1981)........................................................ 12

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)...................................................................... 1

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
   334 U.S. 219 (1948)...................................................................... 28

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021).................................................................. 30

*Optronic Technologies, Inc. v. Ningbo Sunny Electric Co.*,
   20 F.4th 466 (9th Cir. 2021) ........................................................ 20

*Ostrofe v. H.S. Crocker Co.*,
   740 F.2d 739 (9th Cir. 1984)...................................22, 23, 25, 27, 30

*Quinonez v. Nat'l Ass'n of Securities Dealers, Inc.*,
   540 F.2d 824 (5th Cir. 1976)........................................................ 29

*Rebel Oil Co. v. ARCO*,
   51 F.3d 1421 (9th Cir. 1995)........................................................ 11

*Roman v. Cessna Aircraft Co.*,
   55 F.3d 542 (10th Cir. 1995)........................................................ 29

*Sanger Ins. Agency v. Hub Int'l, Ltd.*,
   802 F.3d 732 (5th Cir. 2015).............................................. 12, 16, 21

*Smith v. Pro-Football, Inc.*,
   593 F.2d 1173 (D.C. Cir. 1978)..................................................... 30

*Solinger v. A & M Records, Inc.*,
   586 F.2d 1304 (9th Cir. 1978)............................................ 12, 18, 21

*Syufy Enters. v. American Multicinema, Inc.*,
   793 F.2d 990 (9th Cir. 1986)........................................................ 20

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ............................................................ 30

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) ....................................................... 20

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................... 13, 19

*Vinci v. Waste Management*,
  80 F.3d 1372 (9th Cir. 1994) ..................................... 8, 22, 23, 24

**Statutes**

15 U.S.C. § 1 ................................................................................... 7

15 U.S.C. § 2 ................................................................................... 7

15 U.S.C. § 15 ............................................................................... 11

**Rules**

Federal Rule of Appellate Procedure 29(a) ....................................... 1

**Other Authorities**

P. Areeda & H. Hovenkamp, *Antitrust Law* (4th ed. 2014) .............. 13

## STATEMENT OF INTEREST

The United States has primary responsibility for enforcing the federal antitrust laws and a strong interest in their correct application. The United States has a significant interest in preventing unduly restrictive interpretations of "antitrust injury."  While proof of antitrust injury is not required in federal antitrust enforcement actions, it is required in private antitrust litigation, which provides an important complement to government actions by deterring antitrust violations. Ensuring that courts correctly describe the antitrust standing requirements furthers "the longstanding [Congressional] policy of encouraging vigorous private enforcement of the antitrust laws." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745 (1977).

We file this amicus brief under Federal Rule of Appellate Procedure 29(a).  We take no position on the merits of Plaintiffs' antitrust claims, the truth of their factual allegations, the ultimate disposition of the summary judgment motions, or the merits of Defendants' cross-appeal.

1

## STATEMENT OF ISSUES PRESENTED

1.      Whether the District Court's view of antitrust standing failed to account for Plaintiffs' potential status as "nascent" competitors in the Spokane-area emergency veterinary services market.

2.      Whether Ninth Circuit precedent establishes a pathway to antitrust standing for certain dismissed employees.

## STATEMENT

1.      Defendant National Veterinary Associates, Inc. ("NVA") is a nation-wide "consolidator" of local veterinary hospitals and pet resorts.  It is one of the world's largest veterinary and pet care services companies.  Complaint ¶¶1.6, 1.7 (12-ER-3061-62).  Defendant Pet Emergency Clinic ("PEC") provides emergency veterinary care in the Spokane, Washington area.  *Id*.  ¶¶2.6-2.8 (12-ER-3068).  PEC includes two specialty practices—radiology and surgical specialties—and, as of 2018, was owned by 55 veterinarian shareholders in the Spokane area (only a few of whom were PEC employees).  Plaintiffs' Statement of Facts ("Pls. SF") ¶26 (9-ER-2058).  Plaintiffs Dru Choker and Matthew DeMarco are licensed veterinarians who are former employees and shareholders of PEC.

2

The Complaint alleges that the relevant product market for antitrust purposes is the provision of emergency veterinary services, ¶¶1.3, 5.4, 5.16, 5.17 (12-ER-3060, 3099-3100, 3103), which is a distinct market from general veterinary practices, Pls. SF ¶¶9-13, 125 (9-ER-2054-56). The relevant geographic market, according to the Complaint, is the Spokane area. Complaint ¶¶1.3, 1.15 (12-ER-3060, 3065).

According to Plaintiffs' filings, NVA embarked on a scheme to create a durable monopoly in this market. Acquiring PEC—which had no current competitors for emergency veterinary services in the Spokane area, Pls. SF ¶¶31-33, 124-25 (9-ER-2059-60, 2079-80)—was an essential step in NVA's plan, *id*. ¶¶35, 126 (9-ER-2060, 2080). The acquisition would allow NVA to "create a closed network" for emergency veterinary services. Complaint ¶1.3 (12-ER-3060). PEC, along with its specialty practices, would serve as the "hub," surrounded by "over 50 outlying 'feeder' veterinarian practices," run by PEC's shareholders. *Id*. NVA planned to "mandate[]" that the owners of these practices "refer all customers, new and old, to" the combined PEC-NVA entity. *Id*. Critically, to protect this "closed network," NVA also sought to ensure that no PEC shareholders or employees could open a competing veterinary practice. Pls. SF ¶¶92-93, 142-146, 186-87 (9-ER-2072,

2083-84, 2093).

In pursuit of its plan, NVA began to contact and solicit PEC's shareholders and directors. Pls. SF ¶¶53-70 (9-ER-2065-67). PEC's board of directors met with NVA in early 2017 and took financial steps to prepare for a potential sale to NVA. Consistent with NVA's plan, the board then decided to "impose the 'maximum enforceable non-compete agreement'" on its existing PEC emergency veterinarian employees by means of new employment agreements. *Id.* ¶94 (9-ER-2072-73). These agreements contained a broad non-compete clause, along with "non-solicitation provisions and mandatory referral requirements, all without using those words." *Id.* ¶154 (9-ER-2085-86). Although these agreements were drafted by PEC's corporate counsel, NVA appears to have played a meaningful role. NVA insists that before it will acquire a veterinary practice, non-compete agreements must be in place for all employees of the acquired practice. *Id.* ¶¶92-93 (9-ER-2072). In this case, therefore, NVA would have reviewed the proposed employment agreements. *Id.* ¶142 (9-ER-2083). And, faced with some pushback, NVA discussed with PEC "how to get the ER doctors to sign the employment agreements 'with the non-competes that they were objecting to.'" *Id.* ¶¶145-46 (9-ER-2083-84).

4

PEC's corporate counsel then told PEC's emergency veterinarian employees that they must sign the new employment agreements by November 15, 2017. This date, jointly set by NVA and PEC, was shortly before NVA was expected to come to Spokane to present its purchase offer for PEC. Pls. SF ¶¶121, 150-52 (9-ER-2079, 2085).

Plaintiffs agreed to accept a reduced salary but refused to sign PEC's employment agreement. Pls. SF ¶171 (9-ER-2090). Because of this refusal, PEC terminated Plaintiffs' employment effective December 31, 2017. *Id*. ¶172 (9-ER-2090).

NVA then sought to expand similar restrictions to PEC's shareholders. When NVA ultimately made a purchase offer to PEC's board of directors, it required, as a condition of its offer, "that there would be *shareholder* non-compete restrictions attendant to any acquisition." Pls. SF ¶¶186-87 (9-ER-2093). PEC agreed. In 2018, in a summary of terms sheet contemplating a formal sale agreement, the companies decided to commit all of PEC's 55 shareholders to "non-compete, non-solicitation, and mandatory referral clauses." *Id*. ¶220 (9-ER-2102); *see also id*. ¶¶221-26 (9-ER-2102-03) (agreement bound all PEC shareholders). In particular, these restrictions provided that "shareholders will agree not to compete within a radius of 25 miles of

5

Company" and that the shareholders would not "routinely refer emergency cases to any other hospital within the non-compete zone other than the Company for a period of five years." *Id*. ¶227 (9-ER-2104).

Defendants then prepared an August 17, 2018 merger agreement to implement the summary of terms as the "final . . . purchase agreement." Pls. SF ¶242 (9-ER-2107-08). This agreement contained the same restrictions: "non-compete and non-solicitation paragraphs for emergency veterinary services," including "a five-year, 25-mile non-compete." *Id*. ¶¶226, 253 (9-ER-2103, 2111-12); *see also id*. ¶¶249-65 (9-ER-2110-18) (explaining additional competitive restrictions).

Plaintiffs, as shareholders of PEC, would have been bound by these threatened restraints on competition once the acquisition closed. Plaintiffs could not escape the restraints by selling their shares after they were terminated and into 2018 because, in their understanding, "[d]uring the PEC/NVA negotiation period, PEC would not allow any sale of its shares back to PEC." Pls. SF ¶288 (9-ER-2124); *see id*. ¶300 ("During this time, PEC would not allow any sales of its PEC stock.") (9-ER-2127).

After being fired by PEC, Plaintiffs in January 2018 "sought to

find a building in the Spokane area to set up a competing animal
emergency clinic[.]" Pls. SF ¶293 (9-ER-2125). Upon hearing that
NVA's impending acquisition of PEC would impose non-compete
provisions (including a 25-mile non-compete zone) on all PEC
shareholders, however, Plaintiffs changed course. They put a down
payment on a building in Coeur d'Alene, Idaho (outside the non-
compete zone) "to ensure that if restrictions on stock were imposed, they
would not lose that building in its location." *Id*. ¶¶295-96 (9-ER-2126).
Plaintiffs thereafter opened their own emergency pet clinic in Coeur
d'Alene. *Id*. ¶¶307, 314 (9-ER-2128, 2130). In December 2019, well
after buying the building outside of the non-compete zone, Plaintiffs
were able to redeem their shares from PEC. Complaint ¶4.108 (12-ER-
3098).

NVA's acquisition of PEC ultimately did not close. Although NVA
"suspended" its negotiations with PEC in August 2018, PEC's board of
directors has suggested that the acquisition has only been delayed, not
terminated. Pls. SF ¶¶320-21 (9-ER-2131-32).

2. Plaintiffs sued PEC and NVA in federal court, alleging
violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and
Washington state laws. After discovery, PEC moved for summary

7

judgment on all antitrust claims, and Plaintiffs cross-moved for summary judgment on the Sherman Act claims.

As relevant here, the District Court granted PEC's motion as to the Sherman Act claims. Order (1-ER-2-12), 2022 WL 3129569 (Aug. 4, 2022). The District Court held that Plaintiffs lack "antitrust injury," and therefore also lack "antitrust standing" (of which antitrust injury is a component), for three reasons.

First, the District Court held that Plaintiffs' loss of their jobs at PEC does not constitute antitrust injury. The District Court relied on *Vinci v. Waste Management*, 80 F.3d 1372 (9th Cir. 1994), which upheld dismissal of an employee's antitrust claim that he was terminated when he refused to cooperate in anticompetitive schemes. The District Court reasoned that Plaintiffs, like Vinci, were neither competitors nor consumers in the alleged market. 1-ER-8-9, 2022 WL 3129569 at *4.

Second, the District Court rejected Plaintiffs' argument that they suffered antitrust injury because they were forced to open their new clinic in a different market. It reasoned that Plaintiffs' fear of the impending NVA/PEC merger does not constitute antitrust injury because Plaintiffs' new clinic is not a competitor in the alleged relevant market and, in any event, Plaintiffs cannot assert the injury on behalf

8

of the new business in their capacities as shareholders. 1-ER-9, 2022 WL 3129569 at *4.

Third, the District Court held that any inability of Plaintiffs to enter the Spokane-area market does not provide antitrust standing. It said that Plaintiffs, having refused the Defendants' restrictive covenants in their employment agreements and later redeemed their shares in PEC, can now compete in the Spokane-area market. 1-ER-10, 2022 WL 3129569 at *4.

This appeal followed.

## SUMMARY OF ARGUMENT

The antitrust laws provide broad protections against anticompetitive conduct, including protections to workers who are harmed by the anticompetitive conduct of their employers. In particular, antitrust law provides two pathways to employee antitrust standing that potentially could apply to this case.

First, employees may be "nascent" competitors who have antitrust standing *in that capacity*. Plaintiffs here base their case largely on the claim that Defendants sought to impose anticompetitive restraints on them—including non-compete clauses in their employment agreements,

9

mandatory referral requirements, and geographical non-compete restrictions—precisely because Defendants feared that Plaintiffs would become competitors to the combined NVA/PEC. Plaintiffs adduced facts to warrant an analysis of whether they were not merely employee-shareholders but also potential competitors who sought to, and were capable of, entering the Spokane-area market as competitors to Defendants.

Second, Plaintiffs' case also implicates an avenue under Ninth Circuit law in which Plaintiffs might have suffered antitrust injury by virtue of being dismissed employees. Ninth Circuit precedent grants antitrust standing to dismissed employees when (1) the plaintiff-employees are essential participants in their employer's anticompetitive scheme to harm the employer's customers; (2) the employees' termination was a necessary means to accomplish the scheme; and (3) the employees have the greatest incentive to challenge the antitrust violation.

The District Court, however, denied Plaintiffs standing to pursue antitrust claims by reasoning that they were only employee-shareholders, and therefore neither competitors nor consumers in the

10

relevant market entitled to sue, and that loss of a job cannot be antitrust injury. That categorical reasoning was overbroad in light of the two established theories of employee antitrust standing discussed in this Brief. We urge this Court to describe the antitrust-standing analysis, consistent with applicable law, in a manner that accounts for the various ways in which employee-plaintiffs can have antitrust standing.

## ARGUMENT

"Antitrust injury" is a component of "antitrust standing," which is a limitation on private antitrust suits under Section 4 of the Clayton Act, 15 U.S.C. § 15. "Antitrust injury" means injury, caused by the defendant's conduct, that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). A private plaintiff therefore must show that "his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel Oil Co. v. ARCO*, 51 F.3d 1421, 1433 (9th Cir. 1995).

11

In this case, two pathways by which employees are recognized to have antitrust standing may be relevant: employees as nascent competitors, and employees as essential participants in their employer's anticompetitive scheme.

## I.    Antitrust Law Recognizes Standing for Nascent Competitors.

Courts long have afforded antitrust standing not only to existing industry competitors, but also to prospective competitors—in particular, those who seek to enter a market, have "taken substantial demonstrable steps to enter an industry," and have been "thwarted in that purpose by antitrust violations." *Solinger v. A & M Records, Inc.*, 586 F.2d 1304, 1309 (9th Cir. 1978). Put another way, a plaintiff "is not required [to] be engaged in an ongoing business" to allege an antitrust violation, because the "antitrust laws protect the serious potential competitor as well as the established business." *Huron Valley Hosp., Inc. v. Pontiac*, 666 F.2d 1029, 1033 (6th Cir. 1981). For this reason, as courts have explained, "a plaintiff who never entered a particular market but would have if not for an antitrust violation can undoubtedly challenge an antitrust violation in court." *Sanger Ins. Agency v. Hub Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015). In fact, such firms—often

12

called "nascent" competitors—may be prime targets for antitrust violations, because "early exclusion may be far cheaper than ruining or disciplining a recent entrant who has become established." *Id.* (quoting P. Areeda & H. Hovenkamp, *Antitrust Law* ¶349a, at 258 (4th ed. 2014)).

Employees themselves can be nascent competitors to their employers in the relevant market. To determine whether a plaintiff is a nascent competitor with antitrust standing, this Court has endorsed an "intention and preparedness" test that considers four factors:

> "1. The background and experience of plaintiff in his prospective business . . .
>
> 2. Affirmative action on the part of plaintiff to engage in the proposed business . . .
>
> 3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business . . .
>
> 4. The consummation of contracts by plaintiff . . ."

*Fine v. Barry & Enright Productions*, 731 F.2d 1394, 1397 (9th Cir. 1984).[1]

---

[1] The requirements for being a "nascent" competitor for standing purposes are not precisely or necessarily the same as the requirements for being a nascent competitor for substantive Sherman Act purposes. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir.

Here, Plaintiffs adduced facts that warrant an analysis under these four factors to determine whether Plaintiffs intended to, and were prepared to, compete in the emergency veterinary services market. On summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although we take no position on the truth of Plaintiffs' evidence, or on the ultimate result of this analysis, we note below facts relevant to the four-factor analysis. [2]

First, Plaintiffs point out that they had sufficient "background and experience" to establish a competing business. Plaintiffs are Washington-and-Idaho-licensed veterinarians. Plaintiff Choker

---

2001) (discussing the "exclusion of nascent threats").

[2] It also may be relevant that Defendants themselves considered Plaintiffs to be potential competitors—hence the need to impose non-compete restrictions on them. In a state-court suit filed by Plaintiffs, NVA alleged in a counterclaim that Plaintiffs planned to open a business that would compete against the merged NVA/PEC. *See* NVA opp. to motion to dismiss counterclaim, 2-ER-185 (counterclaim alleges that Plaintiffs "sought to interfere with [Defendants' business] expectancy for the improper purpose of ending the business relationship and competing against PEC"); NVA Counterclaim ¶8 (7-ER-1760) (alleging that Plaintiffs intentionally interfered with a business expectancy "so that plaintiffs could develop their own competitive pet emergency business").

14

practiced with PEC from 2002-2017, and Plaintiff DeMarco practiced with PEC from 2005-2017. Pls. SF ¶¶289, 290 (9-ER-2125). The two of them had been the "two highest producing veterinarians at PEC," *id*. ¶291 (9-ER-2125). Plaintiffs were experienced emergency veterinarians with the necessary skills to compete against Defendants.

Second, Plaintiffs took at least some "affirmative action" toward establishing a competing business. After they were terminated from PEC, Plaintiffs searched for a building in the Spokane area "to set up a competing animal emergency clinic." Pls. SF ¶293 (9-ER-2125). They "preferred initiating their competing emergency practice on Spokane's South Hill, or in the 'Spokane Valley, Spokane, maybe midtown.'" *Id*. ¶294 (9-ER-2126) (citations omitted). But knowing that Defendants' acquisition could be finalized at any time, and that the threatened restraints on competition therefore could be imposed on them through their stock ownership in PEC, Plaintiffs "put a down payment on a building they had located in Coeur d'Alene, Idaho," *id*. ¶296 (9-ER-2126). And they subsequently did open their own practice in Coeur d'Alene. *Id*. ¶314 (9-ER-2130).

Third, the down payment also suggests that Plaintiffs had the

ability to "purchase . . . equipment and facilities necessary to engage in the business," *Fine*, 731 F.2d at 1397, as does the fact that Plaintiffs obtained a $1.4 million loan for the construction of their building in Coeur d'Alene.  Pls. SF ¶307 (9-ER-2128).  Plaintiffs "sustain[ed] a year of construction, acquisition of equipment and supplies, and preparation of a facility to the proper ER standards necessary to open."  *Id*. ¶335 (9-ER-2136).  *Cf. Sanger Ins. Agency*, 802 F.3d at 739 ("Sanger had an office and staff that it claims would only have needed to expand modestly to support its business plan, and [Defendant] has not identified any facilities or equipment that Sanger would have needed to enter the market but was not prepared to obtain.").  The fact that Plaintiffs—as noted above—had been the "two highest producing veterinarians at PEC," *id*. ¶291 (9-ER-2125), further supports a reasonable inference that Plaintiffs are capable of operating a financially viable practice.

Fourth, Plaintiffs actually opened their new emergency clinic in Coeur d'Alene in March 2019.  Pls. SF ¶314 (9-ER-2130).  *Cf. Fine*, 731 F.2d at 1397 (plaintiff's actual participation in three television game shows "is equivalent to 'consumation [sic] of contracts'").  And Plaintiffs

16

were able to "hire 15 experienced PEC employees over time to staff their clinic." Pls. SF ¶336 (9-ER-2136). These facts might support a reasonable inference that Plaintiffs consummated the necessary contracts to operate a competing business.

Plaintiffs may have suffered harm as nascent competitors because they were excluded from the Spokane-area market by the geographic restraint imposed on their PEC shares. They alleged that "[t]he Coeur d'Alene market is substantially smaller than the Eastern Washington/Northwest Idaho corridor market," Complaint ¶4.106 (12-ER-3098), and by having to move to Coeur d'Alene they were forced to incur "debt, start-up costs, substantial time recreating an emergency hospital, and loss of ongoing income, stress, and hardship." *Id*. ¶5.13.2 (12-ER-3102). Plaintiffs set forth facts to suggest that they were "required to initiate and create an entirely new market in Coeur d'Alene, Idaho," Pls. SF ¶333; *see id*. ¶¶334-36 (9-ER-2135-36). A factfinder therefore reasonably could conclude that Plaintiffs were "injured in [their] business or property" within the meaning of Clayton Act Section 4.

Plaintiffs also raised facts to show that this harm was caused "by reason of" the Defendants' alleged violation. *Solinger*, 586 F.2d at 1309. In particular, in January 2018, Plaintiffs opted against opening a competing business in Spokane and instead "put a down payment on a building they had located in Coeur d'Alene" when they learned about PEC's and NVA's agreement to impose non-compete restrictions on PEC's shareholders. Pls. SF ¶¶295-96 (9-ER-2126). They chose Coeur d'Alene because in their understanding it was the closest market to Spokane from which they were not excluded. *Id*. ¶303 (9-ER-2128). And Plaintiffs obtained the construction loan for their building in Coeur d'Alene "because of" the threatened 25-mile non-compete restriction. *Id*. ¶307 (9-ER-2128); *see also id*. ¶333 (9-ER-2135). A factfinder thereby reasonably could find the causation element of nascent competitor standing.

Defendants argued below that the competitive restraints that would have applied to Plaintiffs through their stock ownership in PEC cannot have excluded Plaintiffs from the Spokane-area market because the merger was not consummated and the restraints did not take effect. But antitrust law recognizes that threatened future conduct can have

18

present-day anticompetitive effect. For example, in *Microsoft*, the D.C.

Circuit held that it was anticompetitive of Microsoft to threaten to

support a competitor of Intel's because that threat provoked Intel to

stop developing a cross-platform technology that posed a competitive

risk to Microsoft's operating-system monopoly. 253 F.3d at 77. Here,

NVA and PEC entered into a "signed agreement" committing PEC to

terms of a future sale that would include non-compete restrictions. Pls.

SF ¶220 (9-ER-2102). According to Plaintiffs, this May 14, 2018

agreement "committed Defendants and PEC's 55 shareholders to a '. . .

final employment agreement and purchase agreement (that) will

contain non-compete and non-solicitation paragraphs for emergency

veterinary services.'" *Id*. ¶226 (9-ER-2103). If this non-speculative

threat of future enforcement of anticompetitive restraints caused

Plaintiffs to leave the Spokane-area market in the present, that is a

present-day anticompetitive effect.

The law of attempted monopolization, which Plaintiffs have

invoked here by alleging an attempted monopolization claim, further

illustrates that antitrust law protects against threatened future effects.

Claims of attempted monopolization under Section 2 of the Sherman

Act require proof of predatory or anticompetitive conduct that poses a "dangerous probability" of success. *E.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021). In *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, this Court explained that attempted monopolization can be proved by "conduct that is clearly threatening to competition." 676 F.2d 1291, 1309 (9th Cir. 1982). This Court cited a district court finding that the counterclaim-defendant's "use of excessively long contract terms in its purchases of concession rights . . . *if enforced*," threatened competition. *Id.* (emphasis added); *see also Syufy Enters. v. American Multicinema, Inc.*, 793 F.2d 990, 999 (9th Cir. 1986) (jury could infer specific intent to monopolize "from the threat to run AMC out of town" made by defendant with dominant market share). This law demonstrates that antitrust harm can accrue before an anticompetitive restraint takes effect.

The District Court, however, treated Plaintiffs solely as employee-shareholders and did not consider whether Plaintiffs could have standing as nascent competitors. *Cf. Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) ("the [district] court's decision fatally to pigeon hole Digital Images as a distributor is simply

20

wrong"). This Court and others have found, at the summary judgment stage, that potential competitors have raised disputed issues of material fact as to their antitrust standing. *See Fine*, 731 F.2d at 1398 (reversing summary judgment on standing; "there was evidence from which a trier of fact could conclude that Fine did everything reasonably possible to make a business out of contest participation"); *Solinger*, 586 F.2d at 1309-10 (disputed issue of material fact as to whether plaintiff was a prospective purchaser of a business); *Sanger Ins. Agency*, 802 F.3d at 740 (reversing summary judgment on standing; "a factfinder could conclude that Sanger was prepared to enter at least the Texas market"); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 987-88 (D.C. Cir. 1977) (evidence presented a fact question for the jury on whether plaintiff manifested an intention to enter the professional football business and demonstrated his preparedness to do so). For that reason, this Court should make clear in its opinion that a nascent-competition theory is a viable course to establishing antitrust standing for plaintiffs situated similarly to the employee-plaintiffs here.

*Vinci*, relied on by the District Court, is not to the contrary. There is no indication in that decision that Vinci intended to become, tried to

21

become, or was in any way prepared to become, a competitor to Waste Management in the future after Waste Management purchased Vinci's business and he became an employee of Waste Management. Vinci "complain[ed] that his recycling business was damaged by Waste Management's alleged breach of its settlement agreement and anti-competitive behavior," 80 F.3d at 1375, but that allegation refers to his former business, not a nascent business that he intended to start up in the future. This Court treated Vinci only as a shareholder and dismissed employee, and did not consider whether he might be a nascent competitor.

## II. Ninth Circuit Precedent Recognizes Antitrust Standing for Certain Dismissed Employees.

The District Court relied heavily on this Court's decision in *Vinci*. But *Vinci* itself offers a pathway to antitrust standing for terminated employees who challenge a monopolization scheme aimed at their employer's customers. *Vinci* discussed this Court's decision in *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984), which expressly recognizes antitrust standing for terminated employees essential to their employer's anticompetitive scheme. This avenue to establishing

antitrust standing also counsels against the categorical statements made by the District Court in support of its decision.

**A.** Although *Vinci* generally denies antitrust standing to terminated employees, this Court recognized that *Ostrofe* creates an exception in which "a dismissed employee had antitrust standing," *Vinci*, 80 F.3d at 1376. In *Ostrofe*, a middle manager was fired because he refused to participate in his employer's price-fixing scheme. This Court held that Ostrofe suffered "antitrust injury." "Although Ostrofe was not a competitor or consumer in the labels market, the injury he sustained was such an integral part of the scheme to eliminate competition in that market as to constitute 'antitrust injury' as that concept is developed in [*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982)]." *Ostrofe*, 740 F.2d at 746.[3]

---

[3] *Ostrofe* also discussed *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983), where the Supreme Court identified factors for consideration in determining standing under Clayton Act Section 4. While application of those factors—the nature of the alleged injury, the indirectness of the injury, the existence of an identifiable class of persons whose self-interest would normally motivate them to bring the action, the speculative nature of the damage claim, and the potential complexity of accounting for damages resulting from defendants' behavior in order to avoid the possibility of double recovery, *see id*. at 545 (summary)—could result in an employee-plaintiff lacking standing in a particular case, the factors

As interpreted by *Vinci*, *Ostrofe* grants "a dismissed employee" antitrust standing when that employee (1) "is an 'essential participant' in an antitrust scheme," (2) "the dismissal is a 'necessary means' to accomplish the scheme," and (3) "the employee has the greatest incentive to challenge the antitrust violation." 80 F.3d at 1376.

Certain facts in this case are consistent with the three conditions articulated in *Vinci*. For example, the employee non-compete restrictions arguably were critical to the Defendants' plan to prohibit all existing PEC veterinarians and many surrounding ER veterinarians from competing with the merged NVA/PEC, and thereby to monopolize the Spokane-area market for emergency pet services. If Plaintiffs—and other similarly situated PEC veterinarians—were permitted to join competing practices or establish their own competing practices, Defendants would have little chance to monopolize the market.

In addition, emergency veterinary practice experiences high turnover because most veterinarians are willing to engage in emergency

---

do not categorically deny antitrust standing to workers, as shown by *Ostrofe* itself and the contexts described in subsection B below where antitrust law recognizes employee standing.

24

practice for only a few years. Pls. SF ¶¶325-328 (9-ER-2133). Plaintiffs had been the "two highest producing veterinarians at PEC," *id*. ¶291 (9-ER-2125). Binding long-serving and successful emergency veterinarians like Plaintiffs to the merged NVA/PEC through non-compete restraints in their employment contracts, rather than have them become competitors, arguably was essential to Defendants' ability to achieve or maintain a monopoly.

As to the second condition, Defendants' monopolization arguably could not succeed if potential competitors like Plaintiffs were allowed to stay within PEC and "moonlight[]" (Pls. SF. ¶170, 9-ER-2090) for competing clinics, leave PEC and establish their own competing clinic in the same market, or leave PEC and work for a new entrant in the same market. NVA's general counsel thus said that PEC veterinarians who elected not to sign non-compete agreements could "leave the company and work outside the non-compete zone." Pls. SF ¶147 (9-ER-2084).

In this respect, this case is analogous to *Ostrofe*, where "[Ostrofe's] [r]efusal to cooperate made his discharge inevitable," 740 F.2d at 746, as well as two other cases in which plaintiffs were sales representatives

25

who refused to participate in their employers' allegedly anticompetitive schemes: *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1435 (S.D.N.Y. 1986), and *Ashmore v. Northeast Petroleum Div.*, 843 F. Supp. 759, 767 (D. Me. 1994). Both courts held that coercing the plaintiffs into implementing the schemes, including by terminating their employment, was "a necessary step in effectuating the ends of the alleged illegal conspiracy." *Donahue*, 633 F. Supp. at 1435 (quoting *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982)); *see also Ashmore*, 843 F. Supp. at 767 ("discharging uncooperative sales representatives was a prerequisite to full implementation of the discriminatory pricing system from the standpoint of Defendants").

As to the third condition, Plaintiffs may have the greatest incentive to challenge the alleged monopolization. "NVA assessed PEC to be the only animal emergency clinic in the Spokane area," Pls. SF ¶31 (9-ER-2059), and "PEC agreed that it had no competitors within the Eastern Washington/northern Idaho market area." *Id*. ¶32 (9-ER-2060); *see also id*. ¶125 ("general practices are not in competition with PEC for the services PEC provides.") (9-ER-2080). Accordingly, once NVA accomplished its alleged scheme of monopolization by taking over

26

PEC, there would be no other competitors within the relevant
geographic market with any incentive to challenge the antitrust
violation. And although consumers *might* have a future claim for
higher prices than otherwise would obtain, *if* the merged NVA/PEC
chose to raise prices and *if* NVA/PEC did so in amounts sufficient to
motivate consumers to sue, the harm to Plaintiffs arguably is distinct,
more immediate, and less speculative. *See Ostrofe*, 740 F.2d at 747 ("it
is unlikely that any other victim with knowledge of the conspiracy
sustained a kind of injury that would give him equal incentive to bring
the antitrust violators to account"); *Donahue*, 633 F. Supp. at 1436
(consumers would not "have standing to assert the distinctive claims of
damages sought by plaintiffs"); *Ashmore*, 843 F. Supp. at 767
(discharged employees' injuries "are wholly distinct from the injuries
suffered by any other class of victims").

**B.** The District Court's decision rests on a broad
pronouncement that an employee cannot suffer antitrust injury because
he is "neither a competitor nor a consumer in his role as an employee"
and "loss of . . . jobs does not constitute an antitrust injury." 1-ER-8, 9,
2022 WL 3129569 at *4. But these statements are overbroad. For one,

27

the District Court cited *Vinci* for these rules, but, as explained above, a categorical formulation of the rules omits the *Ostrofe* exception to the rules that *Vinci* itself recognizes. In addition, as explained below, the District Court's unqualified pronouncement runs counter to antitrust law's fundamental protection for workers, including dismissed employees.

As the Supreme Court has explained, the Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers." *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948). The Act "is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices[.]" *Id.* As early as *Anderson v. Shipowners Ass'n of Pacific Coast*, 272 U.S. 359 (1926), the Supreme Court recognized that workers could be the victims of antitrust violations. There, the Court held that a seaman who was refused employment and later lost a job stated a Section 1 claim by alleging that associations of owners and operators of merchant vessels conspired to control the employment of seamen by, among other things, imposing a system of required "certificates" and "cards" that prevented seamen from obtaining jobs that they otherwise

28

would have obtained. *Id.*

Antitrust law therefore recognizes, for example, that a plaintiff who is neither a consumer nor a competitor in the relevant market may have standing when his injury is "inextricably intertwined" with the alleged injury that the defendant sought to inflict on competitors. *McCready*, 457 U.S. at 482-84 (upholding antitrust standing for an employee who was at the same time a subscriber to a group health insurance plan); *Chelson v. Oregonian Pub. Co.*, 715 F.2d 1368, 1371 (9th Cir. 1983) (reversing summary judgment on antitrust injury because whether plaintiff's injury was "inextricably intertwined" was a disputed issue of fact).

Employees also have antitrust standing when they allege an anticompetitive restraint in a labor market in which they sell their labor to employers. *See, e.g.*, *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 544-45 (10th Cir. 1995) (aircraft engineer suffered antitrust injury from, and had standing to bring suit against, alleged conspiracy between aircraft manufacturers not to hire away one another's engineers); *Quinonez v. Nat'l Ass'n of Securities Dealers, Inc.*, 540 F.2d 824 (5th Cir. 1976) (terminated securities salesman had standing by alleging that

securities dealers conspired to deny employment to persons who had been fired by a member dealer); *Smith v. Pro-Football, Inc.*, 593 F.2d 1173, 1175 n.2 (D.C. Cir. 1978) ("the courts have invariably found that athletes have standing to challenge player restrictions in professional sports, since these restraints operate directly on, and to the detriment of, the employee").[4]

And employees may have standing when they act as "whistleblowers" who expose antitrust violations that otherwise would have remain concealed or only exposed later in time. *Ostrofe* recognized this as a basis for standing distinct from the situation discussed above when an employee's injury follows from anticompetitive harm to the market. *See* 740 F.2d at 746-47; *id*. at 747 ("[a]ffording standing to sue to such an employee . . . encourages exposure of such schemes by

---

[4] *Cf. NCAA v. Alston*, 141 S. Ct. 2141 (2021) (Sherman Act Section 1 applied to student-athletes in a labor market); *Aya Healthcare Servs. v. AMN Healthcare, Inc.*, 9 F.4th 1102 (9th Cir. 2021) (Sherman Act applied to non-solicitation agreement that restrained competition in a labor market); *Todd v. Exxon Corp.*, 275 F.3d 191, 213-14 (2d Cir. 2001) (Sotomayor, J.) (suggesting that if evidence supported an alleged unlawful information exchange among employers that depressed the salaries of certain employees, that would show antirust standing for employees and an adverse effect on competition).

persons best situated to know of their existence"); *Ashmore*, 843 F. Supp. at 767 (plaintiffs, as sales representatives for defendant, "were more likely to recognize the antitrust violation at an earlier stage and to vindicate the public interest in prohibiting anticompetitive activities before any purchasers and consumers and before competition suffered extensive injury").

Given the myriad ways that antitrust law protects and grants standing to employees, the District Court was wrong to suggest categorically that a plaintiff must be a "competitor []or a consumer" to establish antitrust standing and that loss of a job can never establish antitrust injury.

## CONCLUSION

This Court should make clear that both theories of employee antitrust standing discussed above remain viable in this Circuit.

Respectfully submitted.


/s/ Steven J. Mintz
STEVEN J. MINTZ


JONATHAN S. KANTER
  *Assistant Attorney General*
DOHA G. MEKKI
  *Principal Deputy Assistant*
  *Attorney General*
MAGGIE GOODLANDER
  *Deputy Assistant Attorney*
  *General*
DAVID B. LAWRENCE
  *Policy Director*
JACOBUS VAN DER VEN
  *Counsel to the Assistant*
  *Attorney General*
DANIEL E. HAAR
STEVEN J. MINTZ
  *Attorneys*
  U.S Department of
  Justice Antitrust
  Division
  950 Pennsylvania Ave., NW
  Washington, DC 20530-0001
  Tel. 202-353-0256
  Email: steven.mintz@usdoj.gov

March 30, 2023

32

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s): 22-35650, 35698**

I am the attorney or self-represented party.

**This brief contains 5,796 words,** excluding the items exempted by Fed. R.
App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.
32(a)(5) and (6).

I certify that this brief *(select only one)*:
[ ] complies with the word limit of Cir. R. 32-1.
[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
[ X ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.
[ ] complies with the length limit designated by court order dated
_____.
[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature: **s/ *Steven J. Mintz***          Date: March 30, 2023

33

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2023, I electronically filed the foregoing Brief for the United States of America as Amicus Curiae Supporting Plaintiffs-Appellants with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the CM/ECF System.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Steven J. Mintz

*Attorney*